**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FALICIA T., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14-cv-04340 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ANDREW MARSHALL SAUL, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability appeal from an adverse decision by an Administrative

Law Judge ("ALJ"). *See* 42. U.S.C. § 405(g). Plaintiff Falicia T. alleges that she is disabled

based on both physical and mental impairments, but this appeal only concerns the latter.

Plaintiff's central argument is that the ALJ erred by not giving controlling (or any) weight to the

opinion of Plaintiff's psychiatrist who, in 2012, diagnosed Plaintiff with posttraumatic stress

disorder ("PTSD") stemming from childhood sexual abuse. The ALJ rejected this opinion, as

well as another similar opinion from Plaintiff's therapist, because Plaintiff only sought treatment

for her mental problems in 2012 and because Plaintiff quickly experienced significant

improvement after taking two medications. The ALJ also found that Plaintiff's testimony was

materially contradicted by her husband's testimony. The Court finds that the ALJ's rationales, as

currently explained, are insufficient to affirm the decision.

### BACKGROUND

Plaintiff initially proceeded *pro se* at the administrative level. On November 5, 2010, she

filed her application for Title II disability benefits. She was then 43 years old and had a spotty

work history.[1] On the initial intake form, her impairments were described in vague terms. (*See* Admin. R. ("R.") at 307 ("1. Nervous condition-asthma-emotional problem/back spasm; 2. back pain.").) At this time, Plaintiff was not receiving any mental health treatment.

From 2010 until April 2012, Plaintiff visited many doctors and went to the emergency room multiple times to address physical problems. The ALJ's decision contains a long summary of these visits. Plaintiff's problems, which were not always tied to a specific diagnosis, included abdominal pain, uterine fibroids, fractures in her hand and fingers, dizziness, back pain, chest pain, muscle spasms, knee pain, and urinary tract infections. Because the physical problems are not germane to this appeal, the Court will not further discuss them.

In 2011, the ALJ asked a psychologist, Ellen Rozenfeld, to answer interrogatories. Dr. Rozenfeld found that Plaintiff had no mental impairments, explaining as follows:

> [Plaintiff] has been seen on numerous occasions for physical issues and there is no suggestion of consideration of a somatoform disorder. No mental health concerns were noted and no dxes were made. She is not prescribed psych meds. Clmt was seen for chest pain, yet there was no mention of anxiety sxs despite the allegation on reconsideration of frequent anxiety attacks. Allegations of a "nervous condition" and anxiety attacks are not supported by the objective file evidence.

(*Id.* at 1136.) Because Dr. Rozenfeld found that Plaintiff did not have any mental impairment, much less a severe one, as required at Step Two, she did not offer any opinion on whether Plaintiff could meet a listing at Step Three.

In April 2012, Plaintiff began counseling with a social worker named Barbara Daubenspeck. In June, she began treatment with a psychiatrist named Tanya Anderson. Plaintiff saw Ms. Daubenspeck five or six times from April to September 2012. (*See id.* at 1302–22.) Plaintiff saw Dr. Anderson four times from June to September 2012.

---

[1] Her earnings varied but were often only a few thousand dollars a year. (R. 258.)

Plaintiff first saw Ms. Daubenspeck on April 21, 2012. In the initial assessment, Ms. Daubenspeck noted that Plaintiff's symptoms included depressed mood, hopelessness, irritability, anxiousness, and somatic complaints. (*Id.* at 1308.) Plaintiff reported that she was unhappy in her marriage (she had been married for 23 years and her husband was 15 years older than she was), that she was isolated from her family, and that she gets upset about things. (*Id.* at 1308.) Ms. Daubenspeck diagnosed Plaintiff with depressive disorder.  (*Id.* at 1309.)

In subsequent visits, Plaintiff and Ms. Daubenspeck discussed various issues. Plaintiff complained that she was "very unhappy" in her marriage and that there "has been physical abuse and police involvement." (*Id.* at 1311.) She stated that she has trouble keeping a job but "does not know why." (*Id.*) She described sexual abuse by three different people during her childhood.

In Dr. Anderson's initial assessment, she diagnosed Plaintiff with PTSD, noting that she had a "chaotic childhood filled with multiple traumas that she has never resolved or found treatment for." (*Id.* at 1378.) Plaintiff reported that she was sexually abused and raped multiple times growing up, including being molested by an uncle when she was 5 to 9 years old, raped by her mother's boyfriend when she was 15, and raped by her sister's boyfriend when she was 16. (*Id.* at 1377.) Dr. Anderson prescribed two medications, Zoloft and Klonopin. Over the next three visits, Plaintiff discussed how she was feeling and how her medications were working.

Both Dr. Anderson and Ms. Daubenspeck provided medical opinions. Dr. Anderson completed two forms. The first was a medical source statement dated July 17, 2012. (*Id.* at 1299–1301.) On September 19, 2012, Dr. Anderson completed another similar questionnaire. (*Id.* at 1356–61.) On these forms, she rendered opinions which, if accepted, would establish that Plaintiff could not work.

Ms. Daubenspeck provided two opinions. On July 9, 2012, she completed a Physical Residual Functional Capacity Questionnaire. She noted that she had seen Plaintiff four times in a three-and-a-half month period and had diagnosed her with depressive disorder and rated her prognosis as "fair." (*Id.* at 1290.) She estimated that Plaintiff's symptoms would interfere "frequently" during a normal work day. (*Id.*) On September 7, 2012, Ms. Daubenspeck prepared a one-page letter, stating that Plaintiff attended a total of six psychotherapy sessions. She noted that Plaintiff "had a difficult childhood and several traumas from which she is trying to process." (*Id.* at 1321.) The letter was mostly a factual summary, but it included the following assessment at the end: "It appears at this time that between her mood disorder with confusion and her medical condition combined she is not able to work at this time." (*Id.*)

In the summer of 2012, Plaintiff was still proceeding *pro se*. She appeared twice before the ALJ for a hearing but got continuances each time so that she could find an attorney. She eventually retained her present counsel and a hearing was held on October 12, 2012. On the day of the hearing, counsel faxed the ALJ a letter brief. (*See id.* at 398–401.) In this brief, counsel noted that Plaintiff previously "was on disability from January 1992 to December 1997 until her benefits ceased." (*Id.* at 399.) Counsel then explained that Plaintiff "did not help herself" when she applied for benefits in 2010 because, first of all, she confusingly stated that she stopped working because she had no car to get to work when the real reason was her impairments. Counsel argued that Plaintiff further undermined her own case by initially presenting it as "***not*** involving mental illness." (*Id.* at 401 (emphasis added).) Counsel summarized as follows: "As a mentally ill person it is not surprising that [Plaintiff] presented her case in such an undisciplined and fragmented manner. That helps to confirm her disability rather than to distract from it." (*Id.*)

At the start of the hearing, the ALJ referred to this letter brief and discussed it with counsel. Counsel again argued that the ALJ should try to obtain Plaintiff's disability file from the early 1990s because this might address any concerns about whether Plaintiff had a long-term mental illness. (*Id.* at 45–46.) Counsel also acknowledged that Plaintiff's mental illness was not "highly documented" but suggested that the pain medication Plaintiff took for her various physical ailments made her sleep more, which in turn lessened the frequency of her psychological symptoms. (*Id.* at 46.)

Plaintiff then testified about her work history, health problems, daily activities, and other matters. Plaintiff's husband testified about similar matters. A vocational expert testified but no medical expert was called.

On January 24, 2013, the ALJ issued a 15-page decision finding that Plaintiff was not disabled. The ALJ applied the five-step process and concluded that Plaintiff had the residual functional capacity ("RFC") to do light work subject to certain restrictions.

Plaintiff filed an appeal to the Appeals Council, raising many of the arguments she raises here. (*Id.* at 402–03.) Counsel complained that the ALJ never sought to obtain the earlier disability file. Responding to the ALJ's assertion that Plaintiff improved with medications, counsel noted that Plaintiff's symptoms "can reoccur and wane periodically." (*Id.* at 402.) Counsel also complained that the ALJ's analysis of the medical opinions was flawed because the ALJ "criticizes each opinion individually not allowing for the cumulative effect of the opinions." (*Id.* at 403.)

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (stating that a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotation marks omitted).

Plaintiff raises the following four arguments for remand: (1) the ALJ erred in not giving controlling weight to Dr. Anderson's opinions, (2) the ALJ erred in finding that Plaintiff did not equal Listing 12.04, (3) the ALJ's credibility analysis was flawed, and (4) the ALJ erred in not including additional RFC limitations. These four arguments could be whittled to just two because the second and fourth arguments turn on whether the ALJ was justified in rejecting Dr. Anderson's opinions.

## I.      Medical Opinions

The Court begins with the arguments regarding Dr. Anderson's opinions. Plaintiff attacks the ALJ's analysis from several angles. As a procedural matter, Plaintiff argues that the ALJ

failed to follow the two steps of the treating physician rule. *See* 20 C.F.R. §404.1527(c)(2).[2] Plaintiff also contends that the ALJ's rationales for rejecting Dr. Anderson's opinions were flawed on their own terms. In particular, she claims that the ALJ failed to acknowledge that Dr. Anderson's opinions were consistent with Ms. Daubenspeck's opinions. More generally, Plaintiff asserts that the ALJ "supplanted" her own opinion in place of Dr. Anderson's opinions. The Court finds that these arguments collectively justify a remand.

The broadest argument is the latter one. Although Plaintiff did not use this exact terminology, her argument is essentially that the ALJ improperly "played doctor." This Court agrees. The Seventh Circuit has repeatedly remanded cases where ALJs failed to rely on an expert opinion to ground their analyses. *See, e.g.*, *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018) ("[T]he ALJ was not qualified to make his own determination without the benefit of an expert opinion."); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (explaining that ALJs should not "play doctor" by summarizing the results of a medical exam without input from an expert). Here, it is not surprising that the ALJ fell into the role of playing doctor given that no medical opinions were even available to support her decision. Although the ALJ sought the opinion of Dr. Rozenfeld, it is undisputed now by the Government that this opinion provided no support for the ALJ's decision. Also, the ALJ did not order a consultative examination or call an impartial expert. The only opinions available were those of Dr. Anderson and Ms. Daubenspeck. The analysis arguably could end here—without further delving into the ALJ's specific rationales—because the ALJ necessarily had to engage in a layperson analysis in rejecting Dr. Anderson's opinions.[3]

---

[2] This rule applies only to claims, such as here, filed before March 27, 2017.

[3] The criticism that the ALJ was improperly playing doctor could be broadened to other parts of the decision beyond Dr. Anderson. No doctor made a finding about which impairments were severe at Step

Turning back to the treating physician rule, it is undisputed that the ALJ did not explicitly follow this rule. Under the rule, an opinion from a treating physician is entitled to controlling weight if it is supported by medical findings and consistent with other substantial evidence. 20 C.F.R. §404.1527(c)(2); *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ must then, in the second step of the analysis, determine what specific weight, if any, the opinion should be given. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). In making this determination, the ALJ must apply the checklist of six factors set forth in 20 C.F.R. §404.1527(c)(2). *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). The checklist of factors are (1) the length of treatment and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors supporting or contradicting the opinion. 20 C.F.R. § 404.1527(c)(2). The larger principle embodied in the rule is that, all things being equal, a treating physician's opinion deserves deference. *See Koelling v. Colvin*, No. 14 CV 50018, 2015 WL 6122992, at *8 (N.D. Ill. Oct. 16, 2015) ("[W]ithin the weighing process, treating physician opinions receive particular consideration.").

The ALJ did not acknowledge or analyze the two steps of the rule, nor did the ALJ mention the six checklist factors. It is true that one of the ALJ's rationales—that Dr. Anderson

Two. The ALJ concluded, without analysis, that Plaintiff's PTSD was a severe impairment but did not discuss whether her depression, diagnosed by Ms. Daubenspeck, also qualified. Likewise, the ALJ's finding at Step Three that Plaintiff did not meet, or importantly equal, a Section 12 mental health listing, required a medical opinion to support it. *See Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) ("A finding of medical equivalence requires an expert's opinion on the issue."); *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) ("[T]he ALJ never consulted a medical expert regarding whether the listing was equaled."). Plaintiff did not raise these specific arguments here, but they provide additional reasons to remand.

did not have a "long-standing" treatment relationship—implicates the first factor. The ALJ also made several loose references to general notions of consistency and supportability, which arguably could be construed as indirect references to the third and four factors. Thus, although the Government does not actually make the argument, one could argue that the ALJ had implicitly followed the checklist. However, such an argument would be unpersuasive. For one thing, as discussed below, the ALJ's rationales were flawed on their own terms. But another reason is that the ALJ did not address **all** of the checklist factors. In particular, the ALJ did not consider the fifth factor: specialization. The ALJ never acknowledged that Dr. Anderson was a psychiatrist, the specialty presumably most relevant.[4] At the same time, the ALJ discredited Ms. Daubenspeck's opinion because she was a "social worker" and "not a physician." (R. at 31.) In sum, if the ALJ had explicitly applied the checklist, she may have reached a different result, but more importantly, she at least would have been forced to provide a more thorough explanation.

Not only did the ALJ fail to follow this established procedure, but she also chose an awkward alternative approach. The ALJ only considered Dr. Anderson's opinions at the very end of the analysis, after making adverse findings that arguably stacked the deck.

To recap, in the Step Three analysis, the ALJ first introduced two key rationales. First, the ALJ noted that there were "discrepancies" between Plaintiff's and her husband's testimony. This was a preview of the ALJ's later credibility finding, the gist of which was that Plaintiff was exaggerating or lying. Second, the ALJ noted that Plaintiff was "generally" feeling better after taking medication. This was the improvement rationale.

---

[4] An unconvincing side argument Plaintiff makes is that the ALJ erroneously believed that Dr. Anderson was a "physiatrist," a person specializing in nerve, muscle, and bone issues, rather than as a "psychiatrist." (*See* Pl.'s Mem. in Supp. of Mot. for Summ. J., Ex. B, Dkt. No. 7.) If true, this would be a good argument. But the ALJ merely made one passing reference to Dr. Anderson being a physiatrist. The most reasonable interpretation is that this was merely a typographical error.

In the RFC analysis at Step Four, the ALJ first found that Plaintiff was not credible based on multiple rationales. The primary one was the alleged testimonial discrepancies. The ALJ began the RFC analysis by reaching a definitive conclusion that Plaintiff was generally untruthful. This finding, however, was made without considering the possibility that Plaintiff's mental impairments may have affected her testimony. This finding also arguably colored the ensuing analysis of the medical opinions.

The ALJ next discussed the three relevant medical opinions, taking them up in reverse order of importance. Her choice had the effect, whether intended or not, of further preemptively undermining Dr. Anderson's opinions. Moreover, as explained below, the ALJ's analysis confusingly gave the impression that the Dr. Anderson's opinions were outliers.

The ALJ first discussed Dr. Rozenfeld's opinion that Plaintiff had no mental impairment of any kind. The ALJ's analysis is confusing because the ALJ gave mixed signals. On one hand, the ALJ gave Dr. Rozenfeld's opinion "great weight" and stated that it was "generally consistent with the evidence up to that point." (R. at 30.) But the ALJ then seemingly reversed course, finding that more recent evidence showed that, contrary to Dr. Rozenfeld's finding, Plaintiff did have a severe mental impairment. The parties offer differing interpretations about what the ALJ meant by these statements. Plaintiff argues that the ALJ was crediting the opinion of Dr. Rozenfeld—a non-treating, non-examining psychologist—over that of Dr. Anderson, a treating psychiatrist. The Commissioner argues that the ALJ did not compare these two experts against each other and basically gave no weight to Dr. Rozenfeld's opinion. But the Commissioner's argument begs the question as to why ALJ bothered to give Dr. Rozenfeld's opinion "great weight" in the first place if she was disregarding it. A reasonable reader might get the impression that Dr. Rozenfeld's opinion provided some support for the ALJ's findings.

This impression carries over into the analysis of Ms. Daubenspeck's opinions. Again, the analysis is confusing. The ALJ first acknowledged that Ms. Daubenspeck had opined that Plaintiff's psychological symptoms would interfere with her ability even to do simple work. But then the ALJ cast doubt on this conclusion by noting that Plaintiff's treatment records "generally indicate that she improved with medication." (*Id.*) The ALJ then continued the analysis by providing the following confusing statement: "Overall, [Ms. Daubenspeck's] opinion is ***generally consistent*** with Dr. Rozenfeld's findings and is ***generally consistent*** with my findings*." (*Id*. at 30–31 (emphasis added).) It is difficult to decipher this statement because it seems so contrary to the record. The ALJ suggests general agreement among the medical opinions, with her own findings falling square in the middle of the consensus. But this conclusion ignores the fact that Ms. Daubenspeck found that Plaintiff was unable even to do simple work whereas Dr. Rozenfeld, at the opposite end of the spectrum, did not even believe that Plaintiff had any impairment. The ALJ's insistence that there was "consistency" among all the opinions is highly questionable.

In the last part of the opinion, the ALJ finally considered Dr. Anderson's opinions, providing three rationales for giving it only "slight weight." (In practical effect, the ALJ gave it "no weight.")  First, the ALJ found that Dr. Anderson did not have a "long-standing" relationship with Plaintiff. Second, the ALJ found that Dr. Anderson's opinions were "not consistent with" evidence showing "general improvement with medication." Third, the ALJ noted that Dr. Anderson's opinions were "inconsistent with" Plaintiff's husband's testimony. (R. at 31.) The ALJ's repeated assertion that Dr. Anderson's opinions were "inconsistent" with other evidence is questionable. Most notably, the ALJ never acknowledged that Dr. Anderson's opinions and Ms. Daubenspeck's opinions were largely consistent. Both opined that Plaintiff likely could not

work. They also agreed on other underlying conclusions as well, including that Plaintiff often got confused and had memory problems and that she had a contentious relationship with her husband and conflicts with other people.

Even if the Court were to ignore all of the above concerns and focus just on the ALJ's three rationales, the Court would still find a remand is required.

**Treatment Relationship.** The ALJ's first rationale was that Dr. Anderson did not have a long-standing relationship. The ALJ noted that Dr. Anderson had treated Plaintiff only two times when the first opinion was rendered and only four times when the second opinion was rendered. This rationale is insufficient for several reasons.

First, the ALJ relied on a blanket rule that a psychiatrist cannot render a reliable opinion after seeing a patient four (or two) times over a several month period. However, because the ALJ cited no authority for this conclusion, the ALJ's conclusion rests on her own layperson judgment. The treating physician rule indicates that questions about the requisite visit frequency require medical expertise to evaluate. *See* 20 C.F.R. § 404.1527(a)(2) ("Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source ***with a frequency consistent with accepted medical practice*** for the type of treatment and/or evaluation required for your medical condition(s)." (emphasis added))

Second, the ALJ took a rigid all-or-nothing approach. Under the ALJ's logic, if the treating physician did not see the claimant a certain number of times (the ALJ did not say exactly how many), then the physician's opinion may simply be disregarded completely. This approach is at odds with statements in the treating physician rule, such as the following, which suggest the analysis is made on a continuum:

> Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.

*Id.* § 404.1527(c)(2)(i). For this reason, courts have held that the proper application of the treating physician rule should result in the total rejection (*i.e.*, assigning "no weight") of the treating physician's opinion only on rare occasions. *See, e.g.*, *Wallace v. Colvin*, 193 F. Supp. 3d 939, 951 (N.D. Ill. 2016); *see also* SSR 96-2p ("A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.").

**Improvement Rationale.** The ALJ's second rationale was that Dr. Anderson wrote in one of her opinions that Plaintiff had a "moderate response to medication," but then she stated in one of her treatment notes that Plaintiff had "reported significant improvement in her symptoms." (R. at 31.) The ALJ believed that the discrepancy between Dr. Anderson's opinion and her treatment notes—specifically, between the words "moderate" and "significant"—was a valid basis for rejecting Dr. Anderson's opinions. It is true that an ALJ may consider possible inconsistences between a formal opinion and the underlying treatment notes in assessing a treating physician's opinion. *See Lafayette v. Berryhill*, 743 F. App'x 697, 699 (7th Cir. 2018).[5] But in this case, the supposed inconsistency rests on too many questionable inferences.

To start, on a purely linguistic level, it is not clear whether the words "moderate" and "significant" are materially different as the ALJ apparently believed. In any event, the deeper

---

[5] *Lafayette* is an unpublished Seventh Circuit order issued after January 1, 2007. Although not precedential, the order demonstrates that an ALJ may consider inconsistencies between a treating physician's opinion and treatment notes and provides a useful point of comparison here. *See* Fed. R. App. P. 32.1(a); 7th Cir. R. 32.1(b).

problems are the ALJ's cherrypicking evidence and playing doctor. The ALJ concluded that Plaintiff significantly improved after taking two medications: Zoloft and Klonopin. Apparently, to the ALJ, the clear implication was that Plaintiff had achieved a sustainable, permanent improvement that would allow her to work full-time. But this conclusion rests on cherrypicked evidence—specifically, a single statement from a single doctor's visit. Set forth below is the full statement from which the ALJ pulled out one phrase:

> Ms. [T] comes in today with her husband, Otis. She reports that she thinks she needs a stronger dose. She reports that she has experienced significant improvement in symptoms, but it feels like the improvement has plateaued. Her husband concurs that she is less irritable, more pleasant, and concerned and able to respond to the needs of her family.

(R. at 1374.) Although this passage states that Plaintiff reported significant improvement at this one visit, this passage also contains other statements, such as Plaintiff's desire for a "stronger dose," suggesting that the improvement was not complete or satisfactory. The ALJ did not acknowledge these contrary contextual facts.

Moreover, at the next visit, Plaintiff reported that her symptoms had worsened. Dr. Anderson observed that her affect was blunted, that there was "concrete evidence that [Plaintiff was] having trouble with simple memory items," and that she was having "some response" to Zoloft. (*Id.* at 1372.) As a result, Dr. Anderson increased the dosage on both the Zoloft and Klonopin. These notes raise the possibility that Plaintiff's symptoms had not improved in a lasting way and that her symptoms were waxing and waning. Courts have often remanded where an ALJ failed to consider the possible episodic nature of symptoms, particularly in cases of mental illness. *See, e.g., Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) ("[C]herry-picking is especially problematic [because] a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [her] overall

condition." (internal quotation marks omitted)); *Byndum v. Berryhill*, No. 17 C 01452, 2017 WL 6759024, at *5 (N.D. Ill. Dec. 15, 2017) ("[T]he ALJ's opinion does not reflect an understanding that a person under treatment for a chronic disease, whether physical or psychiatric, is likely to have 'better days and worse days' and symptoms that 'wax and wane.'"); *Diaz v. Berryhill*, No. 15 C 11386, 2017 WL 497768, at *5 (N.D. Ill. Feb. 7, 2017) (finding that it is "problematic" to rely on "one treatment note" in concluding that the claimant was "responding well to medications").

The ALJ recognized this weakness in her improvement rationale and offered several explanations for why this visit was anomalous. The ALJ first posited—without any expert testimony to support the supposition— that the downturn in symptoms "may be related to situational stressors"—specifically Plaintiff reporting at the visit that she was upset after a disability hearing. (R. at 31.) However, Dr. Anderson never used the phrase "situational stressor" nor otherwise suggested that Plaintiff's relapse was a one-time occurrence. No other doctor endorsed this theory. Moreover, Dr. Anderson stated that Plaintiff's insight into her own condition was "limited." (*Id.* at 1372.) Therefore, the ALJ's reliance on "situational stressors" is another instance of playing doctor. *See, e.g.*, *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("No doctor concluded that Larson's symptoms were just a response to situational stressors as opposed to evidence of depression. The ALJ's conclusion to the contrary thus finds no support in the record."). The ALJ's other explanation was that Plaintiff had not been compliant in taking her medication. Although this fact does appear to be true with regard to the visit in which Plaintiff reported that her symptoms had worsened, this fact requires further analysis because the ALJ did not consider the possibility that Plaintiff's mental illness made it difficult for her to follow medication recommendations. The Seventh Circuit has often raised this concern as well.

*See, e.g., Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015) ("Nor did [the ALJ] note the natural reluctance of a person with psychiatric problems (perhaps of any person) to take powerful pain medications, as they can have serious side effects if not carefully used."); *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) ("[M]ental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease) may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." (citations omitted)).. Here, Plaintiff complained that her medications "put [her] to sleep" and "knock[ed] [her] out." (R. at 79.) So, even if the medications "worked" on some level to mute the symptoms, this does not necessarily mean that she could work full-time. The ALJ did not explore this possibility.

More broadly, it is important to remember that the ALJ's improvement rationale relies solely on statements taken from Dr. Anderson's treatment notes. In other words, the ALJ re-interpreted Dr. Anderson's own treatment notes to reach medical conclusions Dr. Anderson herself never reached. *See Diaz*, 2017 WL 497768, at *4 ("It is well-settled that treating physicians are in the best position to interpret their own clinical findings."). It is also worth noting that the ALJ's first rationale that Dr. Anderson did not have a sufficiently long treatment relationship to render a reliable opinion should logically also apply to the ALJ's own lay conclusions derived from those same notes. For the above reasons, the Court finds that the improvement rationale is insufficient.

**Husband's Testimony.** The ALJ's third rationale was that Dr. Anderson's opinions were inconsistent with the husband's testimony. The ALJ did not explain specifically why this testimony would necessarily cast doubt on Dr. Anderson's opinions. Neither Dr. Anderson nor Ms. Daubenspeck ever suggested that Plaintiff was a malingerer. At the same time, they both

indicated that she had memory problems and poor insight into her condition. Ms. Daubenspeck specifically wrote that Plaintiff gets "easily confused." (R. at 1324.) Dr. Anderson personally observed Plaintiff having memory problems. They both also noted that the couple had a volatile relationship, which included Plaintiff throwing things at her husband and her husband on one occasion hitting Plaintiff with a stick and Plaintiff, in turn, putting him out of the house for 60 days. (*Id.* at 400.) The ALJ did not consider those facts in the analysis. Dr. Anderson may have believed that those facts explained why Plaintiff's testimony was not always consistent.[6]

Another problem with the ALJ's reliance on the husband's testimony is that the ALJ engaged in cherrypicking. In a number of important areas, the husband gave testimony consistent with Dr. Anderson's opinion, as well as with Plaintiff's testimony. The ALJ did not acknowledge these facts. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (holding that an ALJ may not ignore a contrary line of evidence). To cite one prominent example, the ALJ tried several times to get Plaintiff's husband to agree that Plaintiff improved significantly with medication. However, he did not agree, stating that the medication was "not a miracle" and that Plaintiff still had mood swings, specifically "60 different types of mood swings." (R. at 111, 124.) He also testified that her memory problems had worsened and that she had "very ugly and nasty" flashbacks. (*Id.* at 118.) He even stated that he was afraid for his safety and for that of the couple's 14-year old daughter. (*Id.* at 122 ("I don't want our daughter to get hurt physically.").) He believed that Plaintiff could not work full-time because she could not get along with the

---

[6] It is also possible that the husband's memory was imperfect. After the hearing, he submitted a handwritten statement explaining that he suffered from diabetes and other illnesses that caused memory problems. (R. at 1446.) The ALJ did acknowledge this statement but dismissed it because it "was procured after the hearing based on the recommendation of the claimant's attorney." (*Id.* at 29.)

public or co-workers.[7] These facts were not considered by the ALJ, but they tend to support the opinions of both Dr. Anderson and Ms. Daubenspeck. In sum, the Court finds that a remand is required because the ALJ failed to fairly and fully evaluate the medical opinions.

## II. Credibility

Having found that a remand is required, the Court need not engage in an extended discussion of the credibility arguments. In fact, the Court has already addressed several concerns in the above discussion. But a few additional concerns are worth noting here.

As previously stated, the ALJ relied heavily on Plaintiff's limited treatment. The ALJ stated that it was "reasonable to assume" that Plaintiff would have sought treatment earlier if it were true that she had been suffering from PTSD for many years. There are several problems with this argument.

First, it is well-settled that an ALJ may not draw an adverse inference without first exploring possible explanations for the failure to seek earlier, or more extensive, treatment. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (stating that an ALJ should explore possible explanations for why treatments were not pursued); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference"). At the hearing, Plaintiff explained that she did not seek treatment earlier because she was "in denial" and "didn't

---

[7] Plaintiff testified that she had numerous workplace conflicts. Among other things, she testified that she was fired from one job in because she and another lady "got into it" and her employer thought she was rude to customers and that on another job she was reprimanded because she threatened to "blow up the building." (R. at 71–72.) The ALJ did not acknowledge this history, which would be relevant to, among other things, the analysis of Plaintiff's "social functioning" as part of the Paragraph B listing analysis.

want her family to know that there was something actually wrong with [her]." (R. at 66.) It is undisputed that the ALJ did not consider this explanation in the written decision. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 6, Dkt. No. 23.) Second, the ALJ's conclusion rested on her layperson analysis. This fact is evident from the ALJ's statement that it was "reasonable to assume" that Plaintiff would have sought treatment earlier. The ALJ did not explain where this assumption came from or why it was reasonable. As with the other instances of playing doctor, the ALJ's view may turn out to be correct, but it needs support from an expert.

Third, the ALJ did not fully investigate or consider other evidence that may have supported Plaintiff's claim that her mental problems had existed for many years. In particular, the ALJ never inquired into the earlier disability finding in the early 1990s. Counsel raised this issue in the pre-hearing letter brief, then again at the start of the hearing, and finally in the letter brief to the Appeals Council. Yet, the ALJ did not investigate this issue insofar as the record reveals. Another piece of evidence is Dr. Anderson's statement that Plaintiff had been suffering from psychological problems "probably . . . for years." (R. at 1361.) Although this statement is vague as to the precise onset date, it provides some support for Plaintiff's claim. And the Court notes that Plaintiff's diagnosis of PTSD, which the ALJ accepted as valid, was based on sexual traumas from childhood. If so, then a question arises whether it would be likely, as the ALJ's theory presupposes, that Plaintiff's symptoms did not emerge until 2012 when she was well into adulthood. This question is one that an expert should answer.

The Court finally returns to the alleged testimonial inconsistencies between Plaintiff and her husband. In reviewing the record, the Court is concerned whether the ALJ fairly summarized the testimony. The Court will cite a few examples. The ALJ noted that Plaintiff testified that she did not do any heavy lifting, but that her husband testified that she lifted 50-pound bags of dog

food. (*Id.* at 29.) However, the husband's testimony was more equivocal than the ALJ suggested. When first asked who brought in the dog food bags from the car, the husband unequivocally stated that he did and that his wife did not, thus confirming her testimony. (*Id.* at 114–15.) However, the ALJ seemed to question this answer and again asked, in a leading manner, whether Plaintiff helped to bring in the bags. The husband hesitantly stated that "I'm thinking that we both do it." (*Id.*) The ALJ's reliance on this discrepancy comes close to being an outright factual error. *See Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (noting that an ALJ may not base a credibility determination on "errors of fact or logic").

Another example is cooking and chores. The ALJ stated that Plaintiff testified that she does not do "any" cooking or chores, but her husband testified that she does. This analysis strips out all nuance from the testimony. Plaintiff never made a categorical statement that she did not do these activities, but instead stated that she tried to do some of them but had difficulties. (*See* R. at 58 ("I try to get up and do a little housework."); *id.* at 69 ("If I have to clean or cook, I'm constantly dropping things. I'm not able to finish what I started, because I'm constantly in pain."); *id.* at 320 (stating that she prepares meals by putting prepared food into the microwave).) This testimony was largely consistent with the husband's testimony who testified that Plaintiff "can prepare, like, canned items, and she can go into the fridge, too, and prepare certain meats and veggies." (*Id.* at 102.)

One final example: the ALJ stated that Plaintiff testified that she does not go outside the home, but her husband stated that she does go out and had visited her sister recently. (*Id.* at 29.) Once again, the ALJ aggressively interpreted the relevant testimony. Contrary to the ALJ's characterization, Plaintiff testified that she ***sometimes*** went out of the house. For example, she went grocery shopping once a month. (*Id.* at 76.) She obviously went to many doctor's

appointments as well. (*Id.* at 81.) As for the husband's testimony, although he stated that Plaintiff recently visited her sister, he also testified that she visited the sister only "occasionally" and that she did not otherwise go out much. (*Id.* at 106.)

The Court is not suggesting that there were no possible discrepancies—the couple did appear to differ on whether they had taken any out-of-town trips. But as noted above, it is possible that Plaintiff's memory problems contributed to this and other discrepancies. The Court also acknowledges that the ALJ relied on other alleged misstatements, such as Plaintiff's statements about using a cane and her statement about why she stopped working. However, as counsel argued at the hearing, it is possible that Plaintiff's mental illness contributed to those misstatements. The ALJ should have at least considered these possibilities.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. No. 6) is granted and the Government's motion (Dkt. No. 22) is denied. This case is remanded for further consideration consistent with this opinion.

ENTERED:

Date: November 1, 2019

_____
Andrea R. Wood
United Stated District Judge